McCLENDON, J.
In this appeal, the defendant challenges the trial court's judgment that granted summary judgment in favor of the plaintiff, ordered a refund of oil severance taxes paid under protest, and dismissed the matter with prejudice. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
Mantle Oil & Gas, LLC (Mantle), an oil and gas limited liability company domiciled in Texas, is the owner and operator of the Dugas & LeBlanc Well located on the Dugas & LeBlanc Co., Ltd. lease (the Dugas & LeBlanc Lease) in the Napoleonville Field in Assumption Parish. Until April 2015, Mantle also owned and operated the Roberts Well on the Adele Roberts lease *740 (the Roberts Lease) in the LeBlanc Field in Allen Parish.
As to the Dugas & LeBlanc Well, Mantle sells the oil produced from that well to Central Crude, Inc. (Central) pursuant to a written oil purchase contract. Central's trucks pick up the oil stored in Mantle's tanks on the Dugas & LeBlanc Lease and transport the oil off the property. Pursuant to the purchase contract, Central deducts $1.80 per barrel from the price paid for Mantle's oil. Mantle then pays the Louisiana Department of Revenue (Department) 12.5% of the price it receives from Central for the sale of the oil as severance taxes.[1]
Regarding the Roberts Well, Mantle sold the oil produced from that well to Plains Marketing, LP (Plains) pursuant to a verbal agreement based on "Plains South Louisiana Swett Posted Price," plus a $.96 premium beginning January 1, 2009. On April 1, 2013, Plains increased the premium to $15.50. In April of 2015, Mantle sold its interest in the Roberts Well on the Roberts lease and terminated its purchase agreement with Plains.
In May of 2015, the Department began an audit review of Mantle's severance tax payments from January 1, 2012, through December 31, 2014, on oil produced from the Dugas & LeBlanc Well and the Roberts Well. The Department's preliminary findings were questioned by Mantle, and Mantle responded with information and documentation maintaining that it had properly paid all severance taxes due for the audit period. The Department revised its findings, but determined that Mantle still owed taxes, and sent a Notice of Assessment to Mantle in the amount of $73,461.31 for unpaid oil severance taxes, interest, and penalties. The additional taxes that were alleged to be owed were based on the Department's inclusion of the $1.80 per barrel amount in gross receipts for the Dugas & LeBlanc Well and on the Department's "posted field price" for the Roberts Well. On February 5, 2016, in accordance with statutory requirements, Mantle sent a letter to the Department, enclosing its check in the amount of $73,461.31 as payment under protest and providing notice of its intent to file suit because it did not agree that any taxes, interest, or penalties were owed.
On February 29, 2016, Mantle filed its petition against the Department to recover the protested tax payment. Thereafter, the Department filed its answer, and on December 2, 2016, Mantle filed a motion for summary judgment. Following a hearing, the trial court granted the motion for summary judgment, finding that Mantle had properly paid all severance taxes that were due and rejected the Department's assessment of additional taxes, interest, and penalties. The trial court signed a judgment on April 28, 2017, ordering the refund of Mantle's payment under protest and dismissing the matter with prejudice. The Department suspensively appealed.
DISCUSSION
After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966A(3). The summary judgment procedure is favored and shall be construed to secure the just, speedy, and inexpensive *741 determination of every action. LSA-C.C.P. art. 966A(2).
When the issue before the court on the motion for summary judgment is one on which the party bringing the motion will bear the burden of proof at trial, the burden of showing there is no genuine issue of material fact remains with the party bringing the motion. See LSA-C.C.P. art. 966D; Fouquet v. Daiquiris & Creams of Mandeville, L.L.C., 10-0233 (La.App. 1 Cir. 9/13/10), 49 So.3d 44, 46. When a motion for summary judgment is made and supported, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967B. Further, summary judgment is subject to de novo review on appeal, using the same standards applicable to the trial court's determination of the issues. Mabile's Trucking, Inc. v. Stallion Oilfield Services, Ltd., 15-0740 (La. App. 1 Cir. 1/8/16), 185 So.3d 98, 101, writ denied. 16-0251 (La. 4/4/16), 190 So.3d 1207.
Moreover, in a motion for summary judgment, the "only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions." LSA-C.C.P. art. 966A(4).[2] Additionally, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." LSA-C.C.P. art. 967A.
On appeal, the Department initially contends that the trial court erred in allowing Mantle to submit the affidavit of its owner, Chris Barden, in support of the motion for summary judgment. The Department maintains that Mr. Barden's affidavit contained statements that were not based on his personal knowledge as required by LSA-C.C.P. art. 967. We disagree. Upon our review of the record, we find that Mr. Barden's affidavit was based on his personal knowledge. Simply because Mr. Barden did not know what Central did with the oil after it picked up the oil from Mantle's storage tanks and moved it off the Dugas & LeBlanc Lease did not render his affidavit inadmissible due to a lack of personal knowledge. That fact was not material for purposes of the summary judgment motion before the court. Further, Mr. Barden's testimony regarding a lack of a posted field price for the Roberts Well was based on his personal knowledge. Therefore, we find that Mr. Barden's affidavit was admissible.
Article VII, § 4(B) of the Louisiana Constitution provides for the levy of taxes on natural resources severed from the soil or water. "Such taxes may be predicated upon either the quantity or value of the products at the time and place of severance." Id. The taxes shall be paid at a rate of "twelve and one-half percentum of its value at the time and place of severance. Such value shall be the higher of (1) the gross receipts received from the first purchaser, *742 less charges for trucking, barging and pipeline fees, or (2) the posted field price." LSA-R.S. 47:633(7)(a).[3] See also La. Admin Code, Title 61, Part I, § 2903.[4] In this matter, the issues presented for review are the proper application of "the gross receipts received from the first purchaser, less charges for trucking, barging and pipeline fees" and the proper application of "the posted field price."
It is a well-established principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language. Cleco Evangeline, LLC v. Louisiana Tax Com'n, 01-2162 (La. 4/3/02), 813 So.2d 351, 354. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. LSA-C.C. art. 9. This principle applies to tax statutes. Cleco Evangeline, LLC, 813 So.2d at 354. Further, taxing statutes must be strictly construed against the taxing authority; where a tax statute is susceptible of more than one reasonable interpretation, the construction favorable to the taxpayer is to be adopted. Cleco Evangeline, LLC, 813 So.2d at 356.
Additionally, with regard to administrative agency decisions, a reviewing court should afford considerable weight to the agency's construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations. Delahoussaye v. Board of Sup'rs of Community and Technical Colleges, 04-0515 (La.App. 1 Cir. 3/24/05), 906 So.2d 646, 649 (citing Matter of Recovery I, Inc., 93-0441 (La.App. 1 Cir. 4/8/94), 635 So.2d 690, 696, writ denied. 94-1232 (La. 7/1/94), 639 So.2d 1169 ).
In its appeal, the Department maintains that Mantle underpaid its oil severance tax owed pursuant to LSA-47:631, et seq. The Department contends that it assessed additional taxes based on the improper deduction by Mantle of purported transportation costs on the Dugas & LeBlanc Well. Therefore, according to the Department, Mantle's gross receipts were actually higher than the amount received by Mantle. The Department also assessed additional taxes based on a "posted field price" for the Roberts Well, asserting that Mantle was unable to produce a contract or other supporting documentation to verify the value produced from the Roberts Well.
*743 The Dugas & LeBlanc Well
The Department avers that, in its audit, it reviewed Mantle's purchase contract with Central and found that the $1.80-per-barrel deduction was for "gathering and handling." The Department's Revenue Information Bulletin (RIB) excludes "gathering" from transportation costs. "Gathering" is referred to as the "processes or services associated with collecting or moving the oil or condensate prior to its being moved off the lease and placed into a truck, barge, or pipeline." RIB No. 08-015 (6/30/08).[5] Therefore, the Department argues, since the contract itself refers to the deduction as "gathering," which is not an allowable deduction, the purported "transportation" deduction was improper, and it adjusted the reported value of the oil from the Dugas & LeBlanc Well accordingly.[6] The Department also asserts that a deduction can only be taken for costs incurred by a producer for transportation to a point of sale or delivery off the lease. It contends that the plain language of Mantle's contract states that title to the oil transferred to Central and delivery occurred on the Dugas & LeBlanc Lease. The purchase contract provides that "[d]elivery and measurement shall take place and title and risk of loss shall pass to Buyer as the oil enters the inlet flange of Buyer's designated carrier." Thus, according to the Department, any alleged transportation costs would have been for transportation beyond the point of sale or delivery rather than to the point of sale or delivery and, therefore, are not a deductible expense. Lastly, the Department asserts that the regulations provide that transportation costs are deductible only when charged by a third-party and, as Central was a party to the sale, it did not qualify as a third party.[7]
The evidence submitted in support of and in opposition to the motion for summary judgment shows the following. It is undisputed that Mantle and Central are unrelated parties and the purchase contract was an arms-length transaction. Central picks up the oil it purchases from Mantle in its trucks from Mantle's storage tanks on the Dugas & LeBlanc Lease and *744 transports the oil off the lease. Joseph Milazzo, vice-president of the crude oil marketing division of Central, attested that he executed the contract with Mantle, dated October 5, 2010, and that, pursuant to the contract, Central purchases oil produced from wells owned and operated by Mantle including the Dugas & LeBlanc Well. In the purchase agreement, the purchase price of the oil is based on a stated formula "minus gathering and handling of $3.00 per barrel (test oil/recovered oil). The gathering and handling deduction will be $1.80 when the production facilities are in place." Mr. Milazzo attested that by the end of 2010, Mantle had production facilities in place, and Central was deducting $1.80 per barrel, as opposed to $3.00 per barrel, from the purchase price. He attested that Central does not own or operate any of the flowlines, processing equipment, oil tanks, or any other facilities or equipment on the leased premises. Further, he stated that the phrase "gathering and handling" in the purchase agreement referred to transportation of the oil from the Dugas & LeBlanc Lease off the lease using Central's trucks, that Central was not involved in the actual gathering or handling of the oil on the Dugas & LeBlanc Lease, and that Central's only responsibility was to truck the oil off the lease. Mr. Milazzo also attested that the price paid by Central to purchase the oil is reduced by the $1.80 amount, and Central does not bill Mantle separately for the $1.80 per barrel charge.
Mr. Barden's testimony was similar. He stated in his affidavit that Central transports the oil it purchases by truck from Mantle's gathering and storage tanks to Central's receiving facility, located off the Dugas & LeBlanc Lease. Mr. Barden further stated that the $1.80 per barrel charge by Central, although referred to as a "gathering and handling" expense in the purchase contract, was a transportation service and that Central was not involved in the gathering or handling of any oil on the Dugas & LeBlanc Lease. Mr. Barden attested, as did Mr. Milazzo, that Central does not bill Mantle separately for the $1.80 per barrel, but, instead, the price paid by Central to purchase Mantle's oil is reduced by that amount.
We find that the statute is clear and unambiguous, and it was properly applied in the manner that Mantle paid its tax. Mantle computed its severance taxes on the actual amounts it received from Central, i.e., "the gross receipts received from the first purchaser." See LSA-R.S. 47:633(7)(a). The $1.80 per barrel amount in the purchase agreement is not a post-sale "deduction" as asserted by the Department. Rather, the contract price paid by Central to Mantle was a negotiated price between seller and purchaser, and, according to the price formula, the $1.80 per barrel amount is included in the calculations to determine the payment price due Mantle. Mantle sold its oil in the field at the well, and the cost of transportation was borne by Central. Mantle, as the seller, did not take any transportation deduction in the computation of its severance tax, as it did not transport the oil to the purchaser.[8]
Mantle properly computed its severance taxes on the actual amounts that it received from Central, i.e., "the gross receipts received from the first purchaser."
*745 Further, there is nothing to indicate that this was not an arms-length transaction. Accordingly, we find no genuine issue of material fact, and, under the plain language of the severance tax statute, the gross receipts received from Central equaled the amount actually paid pursuant to the purchase agreement. Mantle paid oil severance taxes based on the payments received from Central, and the Department's arguments regarding the Dugas & LeBlanc Well are without merit.
The Roberts Well
Regarding the Roberts Well, the Department argues that Mantle was unable to produce contracts or other sufficient supporting documentation with Plains in response to the Department's audit request. The Department further argues that, even when there is adequate documentation of the price, the severance tax shall be calculated based on the higher of gross receipts or the posted field price. See LSA-R.S. 47:633(7)(a). It contends that since there was no specific field price for this field, the area price became the posted field price. In its audit, the Department identified Platts US Crude Wire-Oil index at LLS Oil Spot at St. James Terminal as the posted field price applicable to the Roberts Well and adjusted the reported value of the oil from the Roberts Well.
Upon our review of the evidence in support of and in opposition to the motion for summary judgment, it is clear that there was no posted field price in the LeBlanc Field in Allen Parish where the Roberts well is located. However, rather than relying on the second option under LSA-R.S. 47:633(7)(a) for gross receipts, which information was supplied by Mantle to the Department after the audit, the Department chose instead to select another field approximately 130 miles from where the well was located to use as a posted field price, but only for those months that the St. James Field posted price was higher than the gross receipts. Although the Department acknowledges that the field price in St. James Parish is not an actual posted price in the LeBlanc Field, it argues instead that it is an "area price" that includes the LeBlanc Field and therefore became the "posted field price." Avra Gauthier, a tax auditor with the Louisiana Department of Revenue who reviewed this matter, stated in her affidavit that, "[i]n the absence of a contract, and pursuant to applicable regulations," she calculated the price per barrel using the St. James Field. This was the only basis given for the use of the "area price."
The Louisiana Administrative Code, Title 61, Part I, § 2903 A, defines a "posted field price" as, the following:
b. Posted Field Price -a statement of crude oil prices circulated among buyers and sellers of crude petroleum and is generally known by buyers and sellers within the field as being the posted price. The posted field price is the actual price of crude petroleum advertised for a field. The area price is a statement of crude oil prices circulated among buyers and sellers of crude petroleum listing prices for different areas of the state, usually listed as north Louisiana and south Louisiana, and generally known among buyers and sellers within the area as the posted price. This area price is the beginning price for crude petroleum of an area before adjustments for kind and quality (including, but not limited to, gravity adjustments) of the crude petroleum. When no actual posted field price is advertised or issued by a purchaser, the area price less adjustments for kind or quality (including, but not limited to, gravity adjustments) becomes the posted field price.
Mr. Barden testified that in reviewing industry publications, he had never seen a *746 posted field price for the LeBlanc Field. He also testified that in reviewing prices in the area, Plains was paying a comparable and "fair price" for the oil. In his affidavit, he attested that because there was no posted price for the LeBlanc Field, Mantle paid severance taxes based on the price it actually received from Plains for the sale of the oil from the Roberts Well.
The Department offered no evidence to show that any adjustments "for kind or quality (including, but not limited to, gravity adjustments)" were made to the area price to establish a posted field price. Further, according to the regulation, "the area price is the beginning price for crude petroleum of an area before adjustments ... of the crude petroleum." We find that the Department failed to establish the area field price less adjustments and, accordingly, failed to establish that the field price in St. James Parish was the actual posted price for the LeBlanc Field. Because there was no posted field price, Mantle calculated the value of the oil based on the "gross receipts received from the first purchaser" pursuant to LSA-R.S. 47:633(7)(a). We find no error in this determination.[9]
There being no genuine issues of material fact, the trial court correctly granted summary judgment in favor of Mantle. Mantle is entitled to a refund of the severance taxes paid under protest in the amount of $73,461.31.
CONCLUSION
For the foregoing reasons, we affirm the April 28, 2017 judgment of the trial court, granting summary judgment in favor of Mantle Oil & Gas, LLC, ordering a refund of oil severance taxes paid under protest, and dismissing the matter with prejudice. Costs of this appeal in the amount of $2,831.00 are assessed against the Louisiana Department of Revenue.
AFFIRMED.

As is customary, Central delivers the severance tax payments to the Department on Mantle's behalf. The purchase contract provides that "Central shall pay 100% of the proceeds, less applicable taxes, to Mantle."

The 2015 Comments to LSA-C.C.P. art. 966 provide that Subparagraph A(4) "contains the exclusive list of documents that may be filed in support of or in opposition to a motion for summary judgment. This Subparagraph intentionally does not allow the filing of documents that are not included in the exclusive list, such as photographs, pictures, video images, or contracts, unless they are properly authenticated by an affidavit or deposition to which they are attached."

Louisiana Revised Statutes 47:633(7)(a) provides:
The taxes on natural resources severed from the soil or water levied by R.S. 47:631 shall be predicated on the quantity or value of the products or resources severed and shall be paid at the following rates:
* * *
(7)(a) On oil twelve and one-half percentum of its value at the time and place of severance. Such value shall be the higher of (1) the gross receipts received from the first purchaser, less charges for trucking, barging and pipeline fees, or (2) the posted field price. In the absence of an arms length transaction or a posted field price, the value shall be the severer's gross income from the property as determined by R.S. 47:158(C).

Louisiana Administrative Code, Title 61, Part I, § 2903 includes a definition of "value," which provides, in pertinent part:
Value -with respect to oil and/or condensate, the value shall be the higher of the gross receipts received from the first purchaser by the producer or the posted field price.
a. Gross Receipts -the total amount of payment:
i. received from the first purchaser in an arm's length transaction[.]

The RIB provides that it "is an informal statement of information issued for the public and employees that is general in nature. A RIB does not have the force and effect of law and is not binding on the public or the Department."

Further, the Administrative Code, Title 61, Part I, § 2903, defines "transportation costs," included in its definition of "value," as:
h. Transportation Costs -there shall be deducted from the value determined under the foregoing provisions the charges for trucking, barging, and pipeline fees actually charged the producer. In the event the producer transports the oil and/or condensate by his own facilities, $0.25 per barrel shall be deemed to be a reasonable charge for transportation and may be deducted from the value computed under the foregoing provisions. The producer can deduct either the $0.25 per barrel or actual transportation charges billed by third parties but not both. Should it become apparent the $0.25 per barrel charge is inequitable or unreasonable, the secretary may prospectively redetermine the transportation charge to be allowed when the producer transports the oil and/or condensate in his own facilities.
The RIB also defines "transportation" to mean "a substantial movement of oil or condensate by truck, barge, or pipeline to a point of sale or delivery off the lease."

As to the Department's argument that Central is not a "third party" under the regulation or RIB authorized to deduct transportation costs, the regulation authorizes the producer to either deduct $.25 per barrel if it transports the oil by its own facilities or actual transportation charges billed by third parties but not both. La. Admin Code, Title 61, Part I, § 2903. The RIB refers to transportation costs charged by those other than the producer as "actual transportation charges billed by third-parties." RIB No. 08-015 (6/30/08).

See Avanti Exploration, LLC v. Louisiana Department of Revenue , Docket No. 9608D (La. Bd. Tax App. 12-6-17) (http://labta.louisiana.gov/decisions.htm), in which the Board of Tax Appeals, under similar facts, stated that "even if we were to assume that the transportation expenses incurred by the first purchaser should somehow be artificially included in the 'gross receipts received from the first purchaser' for purposes of the severance tax base, the statute would nonetheless grant a deduction from [the seller's] gross receipts for a like amount as a 'charge for trucking, barging and pipeline fees.' "

We pretermit as unnecessary any discussion as to the authenticity of certain documents that Mantle received from Plains, copies of which were attached to Mr. Barden's affidavit. The Department made no argument and offered no evidence that the price that Mantle actually received from Plains for the sale of the oil produced from the Roberts Well was incorrect.